BOTTINI & BOTTINI, INC.
   Francis A. Bottini, Jr. (SBN 175783)
   Albert Y. Chang (SBN 296065)
   Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

COTCHETT, PITRE & MCCARTHY, LLP
   Joseph W. Cotchett (SBN 36324)
   Mark C. Molumphy (SBN 168009)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:   (650) 697-6000
Facsimile:    (650) 697-0577
jcotchett@cpmlegal.com
mmolumphy@cpmlegal.com

*Counsel for Plaintiff Anthony Basile*

[Additional counsel listed on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| ANTHONY BASILE, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>     vs.<br><br>VALEANT PHARMACEUTICALS INTERNATIONAL, INC., VALEANT PHARMACEUTICALS INTERNATIONAL, AGMS, INC., PERSHING SQUARE CAPITAL MANAGEMENT, L.P., PS MANAGEMENT GP, LLC, PS FUND 1, LLC, WILLIAM A. ACKMAN, and DOES 1-10,<br><br>                Defendants. | Civil Action No. _____<br><br>Class Action<br><br>**Complaint for Violations of the Federal Securities Laws**<br><br>**Demand for Jury Trial** |

Plaintiff Anthony Basile ("Plaintiff") alleges the following based upon the investigation of his counsel, which included a review of, among other things, United States Securities and Exchange Commission ("SEC") filings, securities analyst reports and advisories, press releases and other public statements, media reports, and court filings in related cases.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth in this complaint, after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of all persons and entities who sold Allergan, Inc. ("Allergan") common stock between February 25, 2014 and April 21, 2014 (the "Class Period") and were harmed as a result of the misconduct alleged below.

2.     Plaintiff asserts claims for, among other things, insider trading against:

(a)     Pershing Square Capital Management, L.P. ("Pershing Square"), PS Management GP, LLC ("PS Management"), William A. Ackman ("Ackman") and PS Fund 1, LLC ("PS Fund 1" and, collectively, the "Pershing Defendants"); and

(b)     Valeant Pharmaceuticals International, Inc. ("Valeant International"), Valeant Pharmaceuticals International ("Valeant USA"), and AGMS, Inc. ("AGMS") (collectively, "Valeant") (Valeant and the Pershing Defendants are collectively referred to as "Defendants").

As set forth in detail below, by purchasing Allergan stock with material, non-public information during the Class Period, and by communicating material, non-public information, Defendants violated, among other things, Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Williams Act of 1968 (the "Williams Act"), codified in 15 U.S.C. § 78n(e), as well as Exchange Act Rules 14a-9 and 14e-3, codified at 17 CFR § 240.14e-3 and promulgated by the SEC under the Exchange Act.

3.      Plaintiff's claims arose from the events leading up to Valeant's June 17, 2014 announcement of a tender offer for Allergan, a multi-specialty health care company headquartered in Irvine, California.

4.      Defendants profited from their misconduct alleged in this complaint.  In November 2014, Ackman said that Pershing Square would realize a profit of approximately *$2.5 billion* from its investment of less than a year in Allergan.  Ackman and Pershing Square were only able to generate such outsized profits unlawfully by, as alleged in detail below, taking advantage of insider information – provided by Valeant – and acquiring a very significant stake in Allergan ahead of the broader market in violation of the securities laws.

5.      To acquire a significant stake in Allergan, Pershing Square formed, on February 11, 2014, PS Fund 1– a shell entity in which Valeant later made a relatively small investment.  The relationship between Pershing Square and Valeant was memorialized in a February 25, 2014 letter agreement, which they entered into in anticipation of Valeant's tender offer for Allergan.

6.      On or about February 6, 2014, Valeant began taking substantial steps toward launching a tender offer directly to Allergan's stockholders.  Valeant hired financial and legal advisors, held multiple board meetings, negotiated the respective financial commitments of Valeant and the Pershing Defendants, and agreed to commit over $75 million to the entity that would acquire Allergan stock.  In their financing agreement, Valeant and Pershing Square went so far as to claim in writing that they were not contemplating a tender offer – a self-serving attempt to circumvent the insider trading rules – yet then agreed in the same document on the procedures each would follow if a tender offer were to occur.  Indeed, Valeant's board meeting materials reflect that its directors recognized a high likelihood of a hostile takeover for Allergan.

7.      In violation of the federal securities laws, Valeant tipped Pershing Square regarding Valeant's tender offer.  Pershing Square, through its shell entity PS Fund 1, began to acquire Allergan stock based upon that inside information.

8.      Armed with the material non-public information that Valeant would launch a tender offer for Allergan's shares, PS Fund 1 began buying up significant amounts of Allergan stock on February 25, 2014 – taking careful steps to avoid making any disclosure of its intentions:

(a)      Rather than buying Allergan stock directly, PS Fund 1 bought zero-strike price "call options."  These zero-strike options gave PS Fund 1 essentially the same ownership rights as if it had purchased the shares directly.

(b)      PS Fund 1's formation agreement was not amended to add Valeant as a member until April 6, 2014, and Valeant's capital contribution – a minor 3 percent of the total funds – was not made until April 10, 2014, just one day before PS Fund 1's ownership of Allergan stock crossed the 5% threshold on April 11, 2014.

(c)      During the ten-day period from April 11 to April 21, 2014, PS Fund 1 continued on an even more rapid buying spree, in order to take advantage of the Williams Act's outdated ten-day window, an oft-criticized provision that allows an investor to wait ten full days after crossing the 5% threshold before disclosing its purchases and intentions to the market.  By the time Pershing Square finally disclosed PS Fund 1's stake on April 21, 2014, they had acquired 9.7% of Allergan's outstanding stock, for a total investment at the time of over $3.2 billion – without providing Allergan's stockholders and the marketplace any disclosure about Valeant's intention to launch a tender offer for Allergan.

9.      Allergan's stockholders and the marketplace, however, were unaware of the Pershing Defendants' undisclosed purchases of Allergan stock.  Nor were they aware that Valeant's tender offer was forthcoming.

10.      As a result, Plaintiff and other Allergan shareholders who sold Allergan stock during the Class Period sold on an uninformed basis at an unfair price – while Ackman was profiting unlawfully from his early inside information about the expected tender offer.

11.     Once Pershing Square had accumulated its position, Valeant publicly announced for the first time that it wished to "negotiate" a merger agreement with Allergan's board, and offered a mix of cash and Valeant stock for each Allergan share. Upon that April 22, 2014 announcement, the value of Pershing Square's investment in Allergan stock increased by a billion dollars.

12.     In its first communications, Valeant carefully avoided disclosing that it planned to launch a "tender offer," but instead claimed to be interested in a friendly merger.  Based on Allergan's response to Valeant's prior overture, however, and as corroborated by analyst comments in February 2014, which underscored that Allergan would not be interested in merging with Valeant – particularly where Allergan's stockholders would be compensated in large part with Valeant stock – Valeant was well aware that a friendly business combination would not likely occur, and conceded as much later on.  Indeed, contrary to Valeant's claim that it was looking for a friendly deal, Valeant and Pershing Square, *from the outset*, engaged in the sorts of pressure tactics commonly associated with hostile tender offers: a media blitz, multiple threatening letters to Allergan's board, and direct communications with Allergan's customers and employees.

13.     As Valeant fully expected, after carefully considering Valeant's proposal, Allergan's board of directors concluded that the offer undervalued Allergan and was not in the best interests of its stockholders, and made clear that Allergan would not engage in discussions about a potential merger transaction like the one Valeant was proposing. Thus, on June 2, 2014, Valeant publicly announced that it would launch a hostile tender offer for Allergan's shares.

14.     Although Valeant ultimately withdrew from the bidding competition for Allergan in November 2014 (after another potential acquirer made a higher bid), Allergan's stock price increased substantially as a result of the tender offer.  Thus, the Pershing Defendants profited handsomely – and illegally – from their massive purchases of Allergan stock during the Class Period, based on material, non-public information.

**THE PARTIES**

**I.     Plaintiff**

15.     As set forth in the accompanying sworn certification, Plaintiff Anthony Basile sold Allergan stock during the Class Period and was harmed as a result.

**II.    Defendants**

    **A.     Valeant**

16.     Defendant Valeant International is a publicly-traded company incorporated under the laws of the Province of British Columbia, Canada with its principal place of business in Laval, Quebec, Canada.  Valeant International manufactures and markets pharmaceuticals, over-the-counter products, and medical devices in the areas of eye health, dermatology, and neurology therapeutic classes. Valeant International actively and directly participated in the proposed offer made to Allergan employees and stockholders.

17.     Defendant Valeant USA is a Delaware corporation with its principal place of business in New Jersey.  Valeant USA actively and directly participated in the proposed offer made to Allergan employees and stockholders, and became a member of PS Fund 1 on April 6, 2014.

18.     Defendant AGMS is a Delaware Corporation and wholly owned subsidiary of Valeant International.  Valeant is pursuing its tender offer through AGMS.

    **B.     The Pershing Defendants**

19.     Defendant Pershing Square is an investment adviser founded in 2003 and registered with the SEC under the Investment Advisers Act of 1940, as amended.  It manages a series of hedge funds. Pershing Square is a Delaware limited partnership with its principal place of business in New York, New York.

20.     Defendant PS Management serves as the sole general partner of Pershing Square.  PS Management is a Delaware limited liability company with its principal place of business in New York, New York.

Complaint for Violations of the Federal Securities Laws

21.     Defendant Ackman is the founder and Chief Executive Officer ("CEO") of Pershing Square.  Ackman, by virtue of his position with Pershing Square, at all relevant times controlled PS Fund 1.

22.     Defendant PS Fund 1 is a limited liability company formed by and among: Pershing Square; Pershing Square, L.P., a Delaware limited partnership; Pershing Square II, L.P., a Delaware limited partnership; Pershing Square International, Ltd., a Cayman Islands exempted company; Pershing Square Holdings, Ltd., a Guernsey limited liability company; and nearly two months later, Valeant USA.  PS Fund 1 was formed for the purpose of serving as the acquisition vehicle in the acquisition of Allergan stock.  PS Fund 1 was formed in Delaware on February 11, 2014, and has its principal place of business in New York, New York.  PS Fund 1 at all relevant times was controlled by Pershing Square, which was, in turn, controlled by Ackman.

**C.    The Doe Defendants**

23.     Plaintiff does not know the names and identities of Does 1 through 10, inclusive, and therefore sues those defendants by such fictitious names.  Plaintiff is informed and believes, and on that basis alleges, that Does 1 through 10, inclusive, are responsible for the acts alleged in this Complaint.  When the true names of such fictitious defendants are ascertained, Allergan will seek leave of this Court to amend this Complaint to name those individuals or entities.

**JURISDICTION AND VENUE**

24.     This Court has subject-matter jurisdiction over this action under 15 U.S.C. §§ 78aa, 78n(a), and 28 U.S.C. § 1331.

25.     This Court has personal jurisdiction because each Defendant has sufficient minimum contacts in the State of California to satisfy California's long-arm statute and constitutional due process requirements as, on information and belief, Defendants have participated in a coordinated takeover attempt of the California-based Allergan.

26.     Venue is proper in the Central District of California pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c).

Complaint for Violations of the Federal Securities Laws

## SUBSTANTIVE ALLEGATIONS

**I.    Valeant Takes Substantial Steps Toward a Tender Offer**

    **A.    Valeant Made an Overture to Allergan in 2012**

    27.    Valeant had been considering a potential transaction with Allergan since the fall of 2012, when Robert A. Ingram was serving on both the Allergan and Valeant boards.

    28.    On September 10, 2012, Valeant's CEO and Chairman, J. Michael Pearson, reached out to Allergan's CEO, David E.I. Pyott, and expressed interest in a merger with Allergan.  Around the same time, in light of the pending merger of Valeant and Medicis Pharmaceutical Corporation, an Allergan competitor, Allergan requested that Mr. Ingram step down from one of his directorships given the potential for a conflict of interest.  Mr. Ingram repeatedly told his Allergan colleagues that he would step down from Valeant's board before the December 2012 Allergan board meeting.

    29.    On the basis of his representations, Mr. Ingram was permitted to attend Allergan board and strategic meetings in September 2012, during which confidential information about Allergan's business and strategy was discussed.

    30.    In December 2012, contrary to his representations, Mr. Ingram instead resigned from Allergan's board, and stayed on at Valeant.  It has since come to light that Valeant had been considering, and indeed, authorized an acquisition of Allergan in September 2012, prior to closing the Medicis transaction and prior to Mr. Ingram's attendance at the September 2012 Allergan board meeting.

    31.    Because of Allergan's lack of interest, Mr. Pearson understood that (a) Valeant would likely have to launch a hostile takeover in order to acquire Allergan; and (b) any such takeover attempt would require substantial financing.  Yet, Valeant's ability to obtain such financing was strained due to a series of aggressive mergers and takeovers in the past few years.  Indeed, according to its April 22, 2014 press release, Valeant entered into over 100 transactions since 2008.  And it was well known that Valeant's business strategy entails aggressive expansion through mergers.

**B.    Valeant Prepared for a Tender Offer in February 2014, Together with Pershing Square**

32.    Because Allergan's board was not interested in a transaction with Valeant in 2012 and declined to engage in discussions, Valeant was well aware in early 2014 that Allergan was not likely to be supportive of a friendly merger.  Therefore, Valeant began plotting an alternate course.

33.    Less than a year after its $8.7 billion acquisition of Bausch & Lomb in November 2013, debt-laden Valeant grew even more interested in acquiring Allergan, which had $1.5 billion in cash, to help even out Valeant's books.

34.    Pershing Square, operated under and controlled by Ackman, was an ideal partner to provide the necessary financing Valeant needed to launch a hostile takeover of Allergan.  Well known as an "activist investor," Ackman typically tried to make money by acquiring minority stakes in companies and threatening their boards with a proxy contest unless they take steps toward a short-term increase in the stock price (often through a merger).  Managing approximately $13 billion in capital, Pershing Square is experienced in handling hostile takeovers.

35.    Around the same time, Pershing Square hired William F. Doyle as a "special advisor."  A business school classmate of Ackman's, Mr. Doyle provided the inside connection Mr. Pearson needed to reach out to Pershing Square.  The retention of Doyle was a calculated decision on the part of Mr. Pearson to form a partnership with Pershing Square in a concerted attempt to launch a hostile takeover of Allergan.

36.    As early as February 4, 2014, and continuing for the next several weeks, Valeant took substantial steps toward a tender offer by engaging in concerted efforts with the Pershing Defendants to start acquiring Allergan stock.

37.    First, through Mr. Doyle, Mr. Pearson and Ackman met on February 4, 2014, to discuss potential partnerships in acquisitions, including the potential acquisition of Allergan.

38.    On February 6, 2014, Mr. Pearson and Ackman had a telephone call in which they further discussed how they might work together to pursue targets in the

- 8 -

pharmaceutical industry.  Conceptually, they discussed a potential structure in which Valeant would identify a target and disclose it confidentially to Pershing Square, after which Pershing Square could decide whether it was interested in working with Valeant with respect to such target and, if it was not, Pershing Square would agree not to make purchases of securities in such target.  No specific targets were discussed on the telephone call.  If Pershing Square were to decide that it was interested in working with Valeant with respect to a particular target identified by Valeant at a later date, then Pershing Square would conduct independent due diligence on the target, confirm its interest in working with Valeant to pursue a potential combination of Valeant and the target, and proceed to develop a strategy to purchase equity in the target.

39.     Around the same time, Mr. Pearson made an appointment to meet with Mr. Pyott the following weekend to follow up on their September 2012 discussions regarding the possibility of combining Valeant and Allergan.

40.     Beginning on February 6, 2014, Valeant engaged three law firms – Sullivan & Cromwell LLP, Skadden, Arps, Slate, Meagher & Flom LLP, and Osler, Hoskins & Harcourt LLP – as counsel in connection with a potential Allergan transaction.

41.     On February 7, 2014, the Finance and Transactions Committee of Valeant's board of directors held a telephonic meeting at which they discussed a possible combination of Valeant and Allergan.  During the next two weeks, Valeant's board – and different subcommittees thereof – met five more times to discuss takeover plans.

42.     On February 9, 2014, Valeant and Pershing Square entered into a confidentiality agreement (which was amended on February 20, 2014), after which Mr. Pearson informed Ackman of Valeant's interest in a potential transaction with Allergan.

43.     With its inside knowledge of Valeant's impending takeover, Pershing Square agreed to use its own funds to acquire a significant stake in Allergan, in order to (a) support Valeant's efforts; and (b) secure massive profits for itself.  In furtherance of Valeant's plan, on February 11, 2014, Pershing Square and other Pershing Square

entities formed a new Delaware limited liability company, PS Fund 1, that would ultimately carry out the stock acquisition.

44.    On February 13, 2014, representatives of Valeant and Pershing Square and their respective counsel met to discuss a potential transaction involving Allergan.

45.    During this period, Valeant's board of directors met at least six times (on February 7, 9, 16, 17, 18 and 21, 2014) to discuss a potential acquisition of Allergan. According to a November 4, 2014 order in *Allergan, Inc. v. Valeant Pharmaceuticals International, Inc.*, No. SACV 14-1214 DOC (ANx) (C.D. Cal.) (the "November 4, 2014 Order"), Valeant's board meeting materials "reflect that Valeant knew there was a high likelihood that a transaction with Allergan would involve a '[h]ostile cash and stock merger.'"

**C.    Valeant and the Pershing Defendants Entered into the Relationship Agreement**

46.    Between February 20, 2014 and February 25, 2014, representatives of Valeant and Pershing Square and their respective counsel exchanged drafts of and negotiated a contractual and financial agreement related to the purchase of equity in Allergan (the "Relationship Agreement"). Valeant and Pershing Square finalized and executed the Relationship Agreement on February 25, 2014.

47.    Under the Relationship Agreement, Valeant agreed to contribute $75.9 million – the maximum allowed without triggering antitrust disclosure requirements – to the proposed "co-bidder entity" in PS Fund 1 to assist with the Pershing Defendants' acquisition of a significant stake of Allergan's stock at non-premium prices before Valeant disclosed its takeover plans to the market. Pershing Square supplied funds of over $3 billion, and retained sole control over PS Fund 1.

48.    In the event that Valeant would launch a tender offer, Pershing Square and Valeant were required under the Relationship Agreement to identify themselves as "co-bidders."

49.    Throughout the weeks during which Valeant was taking these substantial steps, it remained clear to Valeant that Allergan would not likely be interested in negotiating a friendly merger with Valeant.  On February 10, 2014, in connection with Allergan senior management's meetings with analysts, Sanford B. Bernstein & Co. published a report of its discussions with Mr. Pyott, reporting that an acquisition of Allergan by Valeant "was not a good fit and shareholders would hesitate to take Valeant paper."  That same day, Bank of America Merrill Lynch analyst Gregg Gilbert issued a note stating that Allergan would not be interested in a transaction with Valeant.

50.    In light of this negative press, and consistent with his expectation that a friendly combination would not be possible, Mr. Pearson cancelled his scheduled February 14, 2014 meeting with Mr. Pyott.

51.    Given this chronology, Mr. Pearson knew that a negotiated transaction would not be possible and that a hostile tender offer would ultimately be necessary.  Mr. Pearson's anticipation of a tender offer was reflected in Valeant's February 17, 2014 Rule 425 filing with the SEC, in which he stated that he was "correct" in his initial suspicion that Valeant "would ultimately have to go directly to Allergan shareholders."

52.    Thus, before Valeant and Pershing Square entered into the Relationship Agreement on February 25, 2014, and before PS Fund 1 had purchased any shares of Allergan, Valeant had already taken substantial steps toward commencing its tender offer, including: (a) engaging legal counsel; (b) reaching out to Ackman and convincing him to participate as a financier and supporter; (c) holding board and committee meetings regarding the potential offer on February 7, 9, 16, 17, 18 and 21, 2014; (d) negotiating the respective financial commitments of Valeant and the Pershing Defendants; and (e) agreeing to commit over $75 million to the Relationship Agreement to help finance the stock acquisition.

**II.    Valeant and Pershing Square Violated Rule 14e-3 by Tipping and Trading on Material Non-Public Information About a Tender Offer**

53.     In the Relationship Agreement, Defendants specifically claimed to be "co-bidders" in connection with a potential Allergan transaction – likely in order to support an argument that they were all the same "person" for purposes of the insider trading rules.  Armed with this self-serving label, PS Fund 1 (directed by Pershing Square and Ackman) secretly purchased a substantial amount of Allergan stock without filing disclosure documents with the SEC or paying any form of control premium.

54.     Pershing Square was the primary actor in purchasing Allergan stock; it provided approximately 97.5% of the funding for PS Fund 1, and the Relationship Agreement states that Pershing Square Capital Management "will direct the management" of PS Fund 1.

55.     In a series of complex, undisclosed, and carefully-calculated transactions between February 25 and April 21, 2014, PS Fund 1 acquired 9.7% of Allergan's stock (the "Allergan Stock Purchase Program"), primarily through over-the-counter ("OTC") call options and OTC equity futures.  This percentage of Allergan's stock was just shy of the "short swing" profits prohibition in Section 16 of the Exchange Act, which requires holders of greater than 10% of a company's stock to disgorge any profits made in a six-month buy-sell period.

56.     The Pershing Defendants began the Allergan Stock Purchase Program at a time when they unquestionably had material non-public information relating to Valeant's forthcoming tender offer, in violation of Section 14(e) of the Williams Act, as well as Rule 14e-3.

57.     Rule 14e-3 provides that, where any person has taken "a substantial step or steps" (the "offering person") to commence a tender offer of a target company, any "other person" who is in possession of material non-public information relating to that tender offer is prohibited from purchasing or selling any securities of the target company, unless the information is publicly disclosed within a reasonable time prior to the purchase or sale.  The rule imposes a duty to disclose or abstain from trading

- 12 -

irrespective of whether the trader owes a duty to respect the confidentiality of the information.

58.    Valeant took substantial steps toward a tender offer for Allergan's stock beginning on or before February 6, 2014.  Moreover, having already been rebuffed, Valeant knew that it would not likely be able to acquire Allergan through a "friendly" deal, and that a hostile tender offer was therefore inevitable.

59.    Valeant told Pershing Square about Valeant's confidential plans to launch a tender offer precisely because Valeant wanted Pershing Square to trade on that information.  Valeant wanted as many shares as possible to be held by stockholders that Valeant perceived as likely to support an Allergan takeover, but since it could not pay for the shares directly, it turned to Pershing Square.  The illicit tip from Valeant was Pershing Square's incentive to join the scheme.  Pershing Square agreed and acquired 9.7% of Allergan's outstanding stock while in possession of that material, non-public information.

60.    None of the parties disclosed Valeant's takeover intentions until long after the purchases were made, and long after Allergan stockholders – including Plaintiff – and the overall market had been damaged to the benefit of Pershing Square and Valeant.

61.    Plaintiff was harmed and suffered damages as a result of these trades because he did not know the information he was entitled to know under Rule 14e-3's disclose-or-abstain requirement, and consequently sold his Allergan stock for an unfair price and did not receive the benefit of the premium that followed once Valeant's proposal – the material non-public information possessed by Pershing Defendants – was released to the market.

62.    Indeed, the Pershing Defendants reaped a multi-billion-dollar benefit when Valeant's proposal was announced.  The Pershing Defendants thus exploited

Complaint for Violations of the Federal Securities Laws

exactly the sort of informational advantage that Rule 14e-3 was designed to prevent

because, as the SEC stated when adopting the rule:[1]

> The Commission has previously expressed and continues to have serious concerns about trading by persons in possession of material, non-public information relating to a tender offer. This practice results in unfair disparities in market information and market disruption. Security holders who purchase from or sell to such persons are effectively denied the benefits of disclosure and the substantive protections of the Williams Act. If furnished with the information, these security holders would be able to make an informed investment decision, which could involve deferring the purchase or sale of the securities until the material information had been disseminated or until the tender offer had been commenced or terminated. Moreover, the Williams Act was designed to avert a "stampede effect" in the context of tender offers, and the trading on material, non-public information and the dissemination of leaks and rumors in connection with such trading tends to promote this detrimental effect.

As Ackman boasted on November 26, 2014, the Pershing Defendants' profit has now

increased to *$2.5 billion*.

63. In an effort to circumvent Rule 14e-3, Valeant and Pershing Square

attempted in their written agreements with each other to construct a "co-bidder" fiction

– falsely suggesting that they should be considered a single "person" or "offering

person" under the Rule. However, Valeant and Pershing Square's construction of a

shell entity through which to act, and their self-serving description of their own

conduct, are irrelevant. The terms of the Relationship Agreement, the parties'

subsequent actions, and the economics of this attempted takeover make clear that they

were not acting as a single "offering person" at the time of Pershing Square's trades.

64. At the time the proposed acquisition was announced, Valeant was the sole

bidder. The proposal to acquire Allergan was not made by Ackman or Pershing Square,

nor was it made on behalf of Ackman or Pershing Square.

---

[1] *See* Tender Offers, Exchange Act Release No. 17120, 1980 WL 20869 (Sept. 4, 1980).

Complaint for Violations of the Federal Securities Laws

65.     Crucially, only Valeant is offering consideration in the form of shares and cash to Allergan's stockholders.  By contrast, Ackman and the other Pershing Square entities are together offering nothing to Allergan stockholders – they are seeking to sell Allergan stock, as Valeant seeks to buy it.  In fact, as noted in the November 4, 2014 Order, the Form S-4 filed by Defendants clearly stated that:

(a)     "Valeant (through [AGMS]" – not the Pershing Defendants – was offering to acquire Allergan common stock; and

(b)     "[N]one of Pershing Square, PS Fund 1 or any of Pershing Square's affiliates [was] offering to acquire any shares of Allergan common stock in the offer."

66.     Moreover, Ackman was not going to be a board member of Valeant, would not otherwise be a control person of Valeant, and was not going to receive any business or asset of Allergan as a result of the tender offer.  Ackman also confirmed publicly that it was Valeant, and not Pershing Square, that would retain complete control over the transaction.  In a July 21, 2014 interview on CNBC, when asked whether he and Valeant would "raise their offer" in light of Allergan's strong second quarter performance, Ackman responded, "Valeant controls what they're prepared to pay."  In fact, the November 4, 2014 Order found that, "at minimum," "serious questions" were raised as to "whether Pershing Square [was] an 'offering person' or 'co-offering person' exempt from Rule 14-e-3's 'disclose or abstain' rule."  Accordingly, regardless of semantics, Ackman and Pershing Square entities are *not* an "offering person" within the meaning of Rule 14e-3.

67.     Valeant concedes that it was not even added as a member of PS Fund 1 until well into the Allergan Stock Purchase Program – April 6, 2014 – and did not contribute any capital to PS Fund 1 until April 10, 2014.  By this time, PS Fund 1 had acquired more than 11 million shares or options.

68.     Even after Valeant purportedly became a member of PS Fund 1, the nature of Defendants' relationship remained clear: Valeant was an offering person, and

PS Fund 1 – at the direction of Pershing Square – was another person acquiring shares in violation of Rule 14e-3.

69.     Under the Relationship Agreement, Pershing Square retains the authority to act for its own account – even in contravention of Valeant's interests.  The Relationship Agreement provides that it will terminate if a "Third Party Transaction Proposal" – a public proposal by a bidder other than Valeant – is made, and Valeant does not match or exceed that proposal within 45 days.

70.     The Relationship Agreement also gives Valeant unilateral discretion to terminate the contract upon notice to Pershing Square that "it is not interested in consummating" a transaction with Allergan.  Regardless of the "co-bidder" label, under the terms of the Relationship Agreement, Pershing Square was not the same "person" as Valeant with respect to this proposal.  Rather, it remains a separate, independent investor, unaffiliated with Valeant, which has retained the freedom to accept a better deal if one comes along – while Valeant has retained unilateral discretion to terminate the takeover altogether.

71.     Valeant and Pershing also took great pains to conceal their true intent early on by purposely including language in their agreement that "no steps have been taken toward a tender or exchange offer."

72.     This statement was not only demonstrably false, but also clearly crafted in an attempt to circumvent the prohibitions of Rule 14e-3 and requirements of the Williams Act more generally.

## III.    The Allergan Stock Purchase Program Was Carefully Designed to Avoid Required Disclosure

73.     In addition to violating Rule 14e-3, the Allergan Stock Purchase Program was aimed at preserving secrecy and seeking to evade disclosure requirements at every turn.

74.     The manner in which these trades occurred was carefully designed to preserve the secrecy of the block acquisitions and therefore Pershing Square's informational advantage over the market.

75.     On February 25 and 26, 2014, PS Fund 1 acquired approximately 600,000 shares of the outstanding common stock of Allergan.

76.     Between March 3, 2014 and April 8, 2014, PS Fund 1 acquired additional Allergan shares, bringing its holdings up to 4.99% through deep-in-the-money American-style, OTC zero-strike call options.  These zero-strike price options were unique in that, because of the extremely low strike price, they were guaranteed to be exercised and thus were the equivalent of outright ownership.

77.     Just shy of the 5% reporting threshold under Section 13(d), these purchases also allowed Valeant to avoid antitrust disclosure requirements.

78.     Pershing Square then halted trading for two days to let Allergan's stock price settle down to a purported "unaffected" stock price.

79.     Taking advantage of the 10-day window under Section 13(d), PS Fund 1 continued with the second half of its aggressive accumulation of Allergan stock between April 11 and April 21, 2014.  During this window, PS Fund 1 increased its holdings to nearly 10% of Allergan's stock (almost 14 million shares) through additional deep-in-the-money OTC call options and OTC equity forwards on April 21, 2014.

80.     By April 21, 2014, PS Fund 1 had already acquired 9.7% percent of the outstanding Allergan stock – still without disclosing its ownership accumulation or Valeant's takeover intentions.[2]

81.     From the time these significant acquisitions began, Allergan's stock price increased from $125.54 per share on February 25, 2014, to a closing price of $163.65 per share on April 22, 2014, the day of Valeant's announced proposal.

---

[2] On May 1, 2014, PS Fund 1 exercised American-style call options to purchase more than 24 million shares of Allergan common stock and paid the applicable forward purchase price to purchase over 3 million shares of Allergan common stock.

82.     Thus, in order to profit from Valeant's material non-public information at the expense of Allergan's stockholders, the Pershing Defendants accumulated shares rapidly at costs well below the post-announcement share price.  The Allergan Stock Purchase Program was designed to foreclose the prospect that other bidders would come forward, given Valeant's substantial head start.

83.     A review of trading activity in advance of Defendants' Schedule 13D filings on April 21, 2014, also evidences trading that is not explained by Pershing Square's own purchases – and perhaps suggests additional tipping by Valeant and Pershing Square.  According to an April 22, 2014 Wall Street Journal article entitled "Flurry of Allergan Trading Preceded Offer":

> Even after stripping out Mr. Ackman's buying, the volume of stock trading in Allergan during the 10-day period before Monday's announcement was 86% higher than its average over the previous year. . . . [S]uch a significant surge in trading suggests that information about the potential buyout bid could have leaked to other investors, analysts said.

## IV.    Defendants' Statements and Actions Further Reveal the Fact That They Are Separate Persons

84.     The fact that Valeant and Pershing Square were not – and cannot – be considered the same "offering person" is consistent with Valeant's and Ackman's public statements.  For example, in its amended Form S-4, Valeant expressly disclaims any affiliation with Pershing Square, in contending that its proposed acquisition of Allergan would not be a transaction with an "Interested Stockholder" under the terms of Allergan's certificate of incorporation.  Under Article 15 of that certificate, an affirmative vote of at least two-thirds of "disinterested shares" is required for the approval of a transaction between the Company and "any other corporation or any of its affiliates that individually or in the aggregate are directly or indirectly the beneficial owners of 5% or more of the outstanding voting shares of the Company."  In the amended Form S-4, Valeant has taken the position that, because Valeant itself owns only 100 shares, and because in Valeant's view it cannot be said to be the "owner" of the shares of Allergan common stock held by PS Fund 1, a merger between Valeant and

- 18 -

Allergan would not be a "Business Combination" with an "Interested Stockholder."
Although incorrect for purposes of Article 15, Valeant itself has acknowledged that
Valeant is and always has been the offering person, while PS Fund 1 is a separate,
unaffiliated entity.

85.    After Valeant and Pershing Square entered into the Relationship
Agreement, and even after they publicly announced that agreement on April 22, 2014,
Ackman repeatedly represented that he was just another Allergan stockholder looking to
maximize value, whether through a transaction with Valeant or some other company.

86.    In a May 5, 2014 letter to Allergan's Lead Independent Director (Michael
Gallagher), Ackman wrote:

> (a)    "As Allergan's largest shareholder with 9.7% of the common stock,
> we look forward to working with you and the rest of the board to maximize value
> for all Allergan shareholders"; and

> (b)    "we are supportive of Allergan making the best possible deal with
> Valeant or identifying a superior transaction with another company."

87.    In a May 12, 2014 letter to Allergan's Associate General Counsel and
Secretary (Matthew Maletta), Ackman stated the purpose of the demand under
Delaware General Corporation Law Section 220 for the inspection of Allergan's books
and records:

> The purpose of this demand is to enable the Requesting
> Stockholder to communicate with fellow stockholders of the
> Company on matters relating to their mutual interest as
> stockholders… including, without limitation, the solicitation
> of views regarding Valeant Pharmaceuticals International
> Inc.'s proposal to acquire the Company.

In the letter, Ackman correctly referenced the proposal and the transaction as Valeant's
– not Pershing Square's – a characterization consistent with Allergan's public rejections
of the offer and inconsistent with any attempt to cast Pershing Square and Valeant as a
single "person."

88.    On May 13, 2014, Valeant and Pershing Square filed a Preliminary Proxy Statement with the SEC to conduct a non-binding "shareholder referendum," purporting to direct the Allergan board to "promptly engage in good faith discussions with Valeant regarding Valeant's offer to merge with the Company" – but without precluding the Allergan board from engaging in discussions with other parties that might offer higher value. This Proxy Statement defines Pershing Square as the Requesting Shareholder, and requests negotiations with Valeant regarding Valeant's offer.

89.    In a May 19, 2014 letter to Mr. Gallagher, Ackman wrote:

(a)    "I find it inappropriate that Allergan's lead independent director was unwilling to speak to a shareholder without management present";

(b)    "Mr. Pyott has also apparently criticized Pershing Square, explaining that our views should not be considered, as we are somehow conflicted because of our relationship with Valeant. To set the record straight, Pershing Square is Allergan's largest shareholder with nearly 10% of the common stock of the company . . . . [and is] interested only in maximizing the value of [its] investment in Allergan"; and

(c)    "Based on conversations we have had with other Allergan shareholders . . . , we believe that the majority of Allergan shareholders are interested in a potential business combination with Valeant . . . . [I]t is rare that a shareholder is willing to candidly share its views with a Chairman/CEO who will likely lose his job as a result of a proposed transaction[.]"

90.    In a phone conversation with Mr. Pyott on May 13, 2014, Ackman again represented that he was a concerned stockholder, and did not claim to be a bidder with Valeant. Several times during the call Ackman referred to himself as "[Allergan's] largest shareholder." During the call, Ackman stated:

> We have a $5 billion investment in Allergan, we're your largest shareholder, we have zero investment in Valeant, we have no side arrangements with Valeant, we have no other

- 20 -

> agreements with Valeant, other than the agreement that you've seen which says if there's a better value to be had in alternatives [*sic*] transaction to Valeant, and we have the right to accept that value … . The only agenda we have is to maximize the value of our investment in Allergan.

91.     As recently as July 16, 2014, Ackman wrote in a letter to Allergan's board that, if allegations of Valeant's "malfeasance" are true, "then as Allergan's largest shareholder with a $5 billion investment we would of course strongly oppose a Valeant transaction."  These are neither the words nor the actions of an actual bidder.

92.     Ackman and his hedge fund cannot be shielded from liability by calling themselves "co-bidders;" they were *other persons* who were prohibited from trading under Rule 14e-3(a).

93.     At its core, Valeant and Pershing Square's misconduct constitutes an impermissible warehousing scheme.  Valeant leaked its non-public tender offer intentions to Pershing Square, prompting Pershing Square to purchase 9.7% of Allergan stock.  Not only did the leaked information procure significant profits for Pershing Square, it also ensured a presumptively "friendly" stake for Valeant once Valeant launched its tender offer.

**V.     Valeant and the Pershing Defendants Announce Valeant's Takeover Plans**

94.     Section 13(d) requires any entity that directly or indirectly acquires beneficial ownership of more than 5% of a registered class of an issuer's equity securities to file a Schedule 13D disclosure statement with the SEC within ten days of the date the filer crosses the 5% threshold.  The Schedule 13D must contain the information specified in Section 13(d) and the SEC rules promulgated thereunder, including, among other things: the number of shares beneficially owned; the source and amount of the funds to be used in the acquisition; information as to any contracts, agreements, or understandings with any entity relating to the securities of the issuer; and the beneficial owner's plans for the issuer's business and governance.  Section 13(d) and Schedule 13D function together as key elements of the Williams Act, and provide public stockholders with early warning of a potential takeover.

- 21 -

95.     On April 21, 2014, the last possible day permissible under the 10-day period prescribed by Section 13(d) of the Exchange Act, Valeant and Pershing Square shocked the market when they each filed a Schedule 13D purporting to disclose the acquisition of Allergan stock and Valeant's longstanding plan to take over Allergan. However, these filings were deficient in that they did not include important details surrounding the manner in which Pershing Square accomplished the trades.

96.     Valeant and the Pershing Defendants did not adequately disclose the nature of their ownership because they failed to attach and adequately describe the underlying contracts for the OTC call options and OTC equity futures through which Pershing Square acquired its beneficial ownership.

97.     Defendants also failed to attach and adequately describe the confidentiality agreement executed by Valeant and Pershing Square on February 9, 2014, and the February 20, 2014 amendment thereto.

98.     The extent of Defendants' disclosure deficiencies cannot be determined unless and until the underlying contracts are disclosed.

99.     In its April 21, 2014 Schedule 13D, Pershing Square stated that it "intend[s] to engage in discussions" with Allergan's board.  Similarly, in its April 21, 2014 Schedule 13D, Valeant stated that it "currently intends to propose a merger" in which Allergan's stockholders would receive "a combination of cash and Valeant common shares," and that it expected the cash component to total approximately $15 billion.  These characterizations of Defendants' intentions at that time are belied by later admissions.  On June 17, 2014, Mr. Pearson admitted that a tender offer was part of Valeant's ultimate plan, stating: "On April 22nd, we announced our offer for Allergan. *We suspected at the time it would ultimately have to go directly to Allergan shareholders. We were correct.*"

100.     Thus, having already taken substantial steps toward a tender offer at that time, Valeant's Schedule 13D was also deficient in that it did not accurately convey its plans and proposals for Allergan pursuant to the requirements of Item 4.

101.   In an apparent effort to remedy its deficient initial filing, Pershing Square filed a Schedule 13D/A amending the April 21, 2014 disclosure on July 17, 2014. Exhibits 99.14 and 99.15 to the Schedule 13D/A consisted of previously undisclosed share call option and share forward master confirmations.

102.   But Pershing Square again failed to disclose the actual agreements at issue. While the master confirmations provide the generic terms of the transactions, they do not include actual trade details which would contain the financial terms of each option.

103.   By merely filing the form of agreement, but not the actual agreement, Pershing Square has again violated Item 7 of Schedule 13D's requirement that the filing person attach as exhibits "copies of all written agreements . . . relating to . . . the transfer or voting of the securities . . . [or] options, puts, [or] calls . . . as disclosed in Item 6."

104.   Thus, Pershing Square and Valeant's Schedule 13D disclosures remain deficient due to the failure to adequately describe and attach: (a) the February 9, 2014 confidentiality agreement between Pershing Square and Valeant; and (b) the underlying call option and equity futures stock purchase contracts.  Valeant's Schedule 13D disclosure is also false and misleading for failing accurately to describe the purpose of the transactions and its plans in Item 4.

105.   Pershing Square and Valeant are each sophisticated investors with sophisticated legal counsel, and their failure to adequately describe and attach documents required to be included in Schedule 13D suggests an effort to conceal their true intentions.  These contracts, and an understanding of who was involved and what specific terms were agreed to, are essential in order to understand what other steps Pershing Square and Valeant took toward a Valeant tender offer, the identity of the entities helping Pershing Square and Valeant, the consideration these entities received, and the role of these entities in the heretofore unexplained additional purchases of Allergan shares.

## VI.    Valeant Launches an Aggressive Takeover Campaign

106.    On April 22, 2014, Valeant delivered to Allergan a formal, unsolicited proposal and draft merger agreement at $48.30 in cash and .83 of Valeant stock per Allergan share.

107.    While Valeant initially tried to characterize its takeover as a "merger" in an effort to skirt the federal securities regulations triggered by a tender offer, its plan from the very beginning was to launch a tender offer.  Indeed, Valeant's aggressive and hostile tactics from the outset – as detailed herein – constituted a *de facto* tender offer in everything but the actual name.  When Allergan did not immediately agree to negotiate with Defendants, Valeant sought, with Ackman's help, to persuade stockholders that a deal was "inevitable," as stated in Valeant's June 3, 2014 Rule 425 filing.

108.    Meanwhile, Ackman openly bragged about how he was able to make this unprecedented gain without, in his view, technically violating the insider trading rules.  At a lunch hosted by Valeant, Ackman and Mr. Pearson "acknowledged that there may be some questions around how Pershing Square/Bill Ackman accumulated AGN shares ahead of the takeout offer being announced publicly, but they stressed everything they have done is completely legal."[3]

109.    Under the facade of pursuing a negotiated merger, Valeant launched an aggressive campaign, using the classic playbook for hostile tender offers: an offensive public relations and media blitz, pre-packaged investor presentations trumpeting the "synergies" of a combined company and the shortcomings of Allergan as a stand-alone company, concerted stockholder outreach, and direct communications with Allergan employees and customers.

110.    Valeant undertook an aggressive public relations campaign with financial analysts and the media.  In all of its communications, Valeant made clear that it

---

[3] Credit Suisse, ALLERGAN INC.: TAKEAWAYS FROM VRX LUNCH: MANAGEMENT PROVIDES COMPELLING POINTS FOR AGN TAKEOUT (Apr. 27, 2014).

1  intended to rely on its continued "slash and burn" strategy by making deep cost cuts at

2  Allergan's headquarters, particularly in the area of research and development.

3      111.   On April 28, 2014, Valeant hosted an analyst event to discuss its proposal

4  to Allergan.  At the event, Valeant emphasized that the likelihood of another bidder

5  emerging was low, and that Allergan should not "take more than about 30 days" to

6  evaluate.[4]

7      112.   On a conference call with equity analysts on Thursday, May 8, 2014, Mr.

8  Pearson said that he and Valeant CFO Howard Schiller had been traveling across the

9  United States to meet with Allergan's top stockholders, as well as Valeant's top

10  stockholders.  According to a May 8, 2014 article in the Wall Street Journal by Joseph

11  Walker, Mr. Pearson stated: "We have been in New York, Baltimore, Boston, Los

12  Angeles, San Francisco, Vancouver and South Florida.  So far, all of the feedback has

13  been overwhelmingly positive."

14      113.   Contrary to Mr. Pearson's statements, however, many Allergan

15  stockholders, including Dan Davidowitz, Chief Investment Officer of Polen Capital

16  Management LLC, expressed disapproval of Valeant's bid for Allergan.  According to a

17  May 6, 2014 article in the L.A. Times by Stuart Pfeifer, Allergan's co-founder and

18  former Chairman, Gavin S. Herbert, urged its directors to reject a buyout offer saying

19  that Valeant's slashing the research and development budget would "really kill this

20  company . . . I am very much against that."

21      114.   On May 8, 2014, according to the Wall Street Journal, Schiller warned of

22  more aggressive measures, explaining that Valeant and Pershing Square would request a

23  stockholder list from Allergan in order to "commence a shareholder referendum that

24  will determine that the Allergan shareholders are supportive of Allergan's board

25  engaging in negotiations with us in parallel with other efforts they may be undertaking."

26  Schiller also made clear that Valeant and Pershing Square were willing to bypass the

27  ────────────
   [4] *Id.*

28

Allergan board entirely, stating that "if necessary, we will also pursue holding a special meeting to remove some or all of the Allergan board members."

115.    Meanwhile, according to a May 9, 2014 article in the Wall Street Journal by Rob Copeland, Ackman bragged that he was already up about 38% on his Allergan stake, less than one month after the unusual deal became public.  The gains add up to almost $1 billion in paper profits.

116.    Throughout April and May 2014, Valeant also undertook to communicate directly with Allergan's customers and employees. Among other tactics, Valeant's management and other personnel:

(a)    Began representing to Allergan's customers that the acquisition was a "done deal" and "we own them";

(b)    Offered rebates on both Allergan and Valeant purchases;

(c)    Contacted Allergan sales representatives and welcomed them to Valeant;

(d)    Visited Allergan customers, announcing that they were Allergan's new sales representatives;

(e)    Began telling Allergan customers that Allergan's SkinMedica line was going to be divested; and

(f)    Sent a letter to its customers discussing its merger proposal and plans for the joint company going forward.

## VII.    Valeant Formally Launches a Proxy Contest and Hostile Exchange Offer

117.    Two weeks after Allergan's board of directors "unanimously determined that Valeant's unsolicited proposal substantially undervalues Allergan," on May 28, 2014 Valeant increased its offer by $10 cash per share.

118.    Before the Allergan board had the chance to consider the revised offer, Valeant raised its offer again on May 30, 2014, by increasing the cash portion of its bid to $72.00 per share (the "Revised Proposal").

119.    As part of the Revised Proposal, Pershing Square agreed to forego all cash and accept 100% of its consideration in Valeant stock using an exchange ratio based on the previous day's closing stock prices of Allergan and Valeant.  Pershing Square would receive $20.75 per share less consideration than other Allergan stockholders, providing substantially more value and cash for other Allergan stockholders.[5]  Pershing Square was again stepping in to help finance a deal that Valeant could not afford.

120.    On June 2, 2014, Pershing Square filed a preliminary proxy statement with the SEC, contemplating the solicitation of proxies to call the Special Meeting.  At the meeting, Pershing Square would (a) propose removing and replacing six unspecified directors from the current Allergan board; (b) propose an amendment to Allergan's bylaw provisions regarding special stockholder meetings; and (c) request that the Allergan board promptly engage in discussions with Valeant.  In a presentation to investors that day, Valeant abandoned the pretense of "negotiations" with the Allergan board and reaffirmed that it was "preparing to launch an exchange offer."

121.    Allergan's board unanimously rejected the Revised Proposal on June 10, 2014, reiterating its belief that the increased proposal still "substantially undervalues Allergan, creates significant risks and uncertainties for Allergan's stockholders and does not reflect the Company's financial strength, future revenue and earnings growth or industry-leading R&D."

122.    On June 18, 2014, Valeant filed a Registration Statement on Form S-4 and Schedule TO with the SEC, finally commencing the tender offer that it had been planning for several months.

123.    On July 11, 2014, Valeant and Pershing Square filed a definitive proxy statement with the SEC, soliciting proxies to call the Special Meeting.

---

[5] Pershing Square was able to make this election because it had already obtained a paper profit of approximately $1 billion through its rapid accumulation program while in possession of material, non-public information. Pershing Square is effectively using those ill-gotten gains to help finance Valeant's takeover effort.

## CLASS ACTION ALLEGATIONS

124.    Plaintiff brings this action as a class action on behalf of all persons and entities who sold Allergan stock during the Class Period (between February 25, 2014 and April 21, 2014).  Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

125.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  As of February 14, 2014, Allergan had 4,420 shareholders of record and in excess of 300 million shares of common stock outstanding, and Allergan's average daily trading volume during the Class Period was approximately 3 million shares.  Record owners and other members of the Class may be identified from records maintained by Allergan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

126.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' misconduct in violation of federal law that is set forth in this complaint.

127.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

128.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Pershing Defendants violated the Williams Act and its attendant regulations by acquiring shares of Allergan while in possession of

1  material non-public information relating to Valeant's intent to make a tender

2  offer for Allergan securities;

3       (b)    whether Valeant violated the Williams Act and its attendant

4  regulations by communicating material, non-public information relating to

5  Valeant's intent to make a tender offer for Allergan securities to Pershing Square;

6       (c)    whether Defendants took substantial steps during the Class Period

7  to commence a tender offer for Allergan securities;

8       (d)    whether each Defendant constitutes a co-offering person; and

9       (e)    whether Class members have sustained damages and, if so, the

10  proper measure of such damages.

11      129.   A class action is superior to all other available methods for the fair and

12  efficient adjudication of this controversy since joinder of all member is impracticable.

13  Furthermore, the expense and burden of individual litigation makes it impracticable for

14  members of the Class to individually seek redress for the wrongs done to them.  There

15  will be no difficulty in the management of this action as a class action.

16  **CAUSES OF ACTION**

17  **Count I**
**Violation of Section 14(e) of the Exchange Act and the Rules**
**Promulgated Thereunder**
**Against All Defendants**

18

19      130.   Plaintiff incorporates by reference and realleges each and every allegation

20  contained above, as though fully set forth below.

21      131.   Defendants have engaged in fraudulent, deceptive, and manipulative acts

22  in connection with taking substantial steps toward a tender offer, including trading on

23  material non-public information.

24      132.   Rule 14e-3(a) provides that once an offering person has "taken a

25  substantial step or steps to commence a tender offer," then "it shall constitute a

26  fraudulent, deceptive or manipulative act or practice" for any person who is in

27

28

possession of material non-public information relating to the tender offer (other than the offering person) to acquire shares in the target.

133.    Rule 14e-3(d) provides that under such circumstances, it shall be unlawful for an offering person "to communicate material, non-public information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section."

134.    The purpose of the rule is to prevent parties with non-public information that a tender offer is going to be commenced at a premium price from transacting with investors who do not have such information – unless they disclose that information first.

135.    After Valeant took substantial steps to commence a tender offer for Allergan shares, the Pershing Defendants acquired shares of Allergan stock while in possession of material non-public information acquired directly from Valeant relating to that tender offer.  In light of the Relationship Agreement, it was reasonably foreseeable that Valeant's communication would result in a violation of Rule 14e-3.  Valeant knew and intended that the Pershing Defendants would trade on the material, non-public information by buying shares in Allergan and otherwise taking steps to acquire the right to purchase stock in Allergan.

136.    The Pershing Defendants knew or had reason to know that the information was non-public, and that the information was provided by Valeant, the bidder.

137.    Section 14(e) provides, in relevant part: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

138.    Valeant's tender offer materials violated Section 14(e) because they omitted material facts regarding Valeant and Pershing Square's relationship and

intentions with regard to the proposed transaction; the certainty of the proposed transaction; purported cost synergies and other financial issues; and Robert Ingram's service on the Allergan and Valeant boards.

139.   The Pershing Defendants further violated Section 14(e) by failing to disclose material information regarding Valeant's anticipated tender offer, and the substantial steps that Valeant had taken toward such tender offer, before purchasing Allergan stock.

140.   Defendants had the motive and opportunity to commit fraud.  Valeant was motivated to facilitate Pershing Square's purchase of a large stake in Allergan, and thereby ensure critical financing and friendly backing in support of its hostile takeover attempt.  Pershing Square was motivated to purchase its stake in Allergan by trading with Allergan stockholders on the basis of material, non-public information, and thereby reap the enormous financial gains accruing to it from this information imbalance.  Both Defendants made false and misleading statements to the market in an attempt to hide the details of their conduct.

141.   Defendants' fraudulent, deceptive, and manipulative acts violated their respective obligations under Section 14(e) of the Williams Act and the rules adopted thereunder, including, at minimum: 14e-3(a) (prohibiting the Pershing Defendants from trading on non-public material information in connection with a tender offer); and 14e-3(d) (prohibiting Valeant from communicating non-public material information in connection with a tender offer).

142.   Defendants' violations of Section 14(e) of the Williams Act, and the rules adopted thereunder, have caused Class members substantial monetary damages.

## Count II
### Violation of § 20A of the Exchange Act
### Against the Pershing Defendants

143.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth below.

144.    As detailed herein, the Pershing Defendants were in possession of material, non-public information concerning Allergan, and traded on the basis of that information to obtain profits of approximately $2.5 billion.

145.    The Pershing Defendants' trades were made contemporaneously with the trades of Plaintiff and other Class members.

146.    Plaintiff and the Class suffered damages as a result of these trades because Plaintiff and the Class did not have the information required to be disclosed under Rule 14e-3 and therefore sold for an unfair price and did not receive the benefit of the premium that followed once the Pershing Defendants' material non-public information was released to the market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in his favor and against all defendants as follows:

A.    Determining that this action is a proper class action, certifying a class under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff as a class representative and Plaintiff's counsel as lead counsel for the class.

B.    Declaring that the Pershing Defendants violated the Williams Act and its attendant regulations by acquiring shares of Allergan while in possession of material non-public information relating to Valeant's tender offer.

C.    Declaring that Valeant violated the Williams Act and its attendant regulations by communicating material, non-public information relating to Valeant's tender offer to Pershing Square.

D.    Awarding damages to Plaintiff and the Class under the Exchange Act, together with interest.

E.    Awarding Plaintiff his costs and disbursements in this action, including reasonable attorneys' and experts' fees.

F.    Granting Plaintiff such other and further relief as the Court may deem just and proper.

# DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated: December 16, 2014

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN271173)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:    (650) 697-6000
Facsimile:    (650) 697-0577
jcotchett@cpmlegal.com
mmolumphy@cpmlegal.com

Joanna W. LiCalsi (SBN 288771)
2716 Ocean Park Boulevard, Suite 3025
Santa Monica, California 90405
Telephone:    (310) 392-2008
Facsimile:    (310) 392-0111
jlicalsi@cpmlegal.com

*Counsel for Plaintiff Anthony Basile*

- 33 -

Complaint for Violations of the Federal Securities Laws